IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIN VECCHIO,

       Plaintiff,

v.

ANTHONY M. DELUCA in his official and
individual capacity and STEVEN H. STETLER
in his official and individual capacity.

       Defendants.

09cv1485
**ELECTRONICALLY FILED**

**MEMORANDUM OPINION RE: MOTIONS FOR
SUMMARY JUDGMENT (DOCS. NOS. 93, 95)**

### I.    Introduction

Defendants Anthony M. DeLuca and Steven H. Stetler have filed separate motions for summary judgment on plaintiff Erin Vecchio's employment discrimination -- First Amendment retaliation claims brought pursuant to 42 U.S.C. § 1983. Plaintiff alleges that DeLuca and Stetler conspired to terminate her as punishment for testifying in a Pennsylvania grand jury investigation with regard to DeLuca.[1]

The Amended Complaint alleges that Vecchio was the former Tax Account Collections Manager for the Pennsylvania Department of Revenue, which is responsible for administering the Commonwealth's tax laws, until her termination in August 2009. Amended Complaint, ¶ 3-4. At all relevant times, DeLuca was a member of the Pennsylvania House of Representatives, representing the 32nd Legislative District in Allegheny County, and Stetler was the Secretary of

---

1 The Amended Complaint sets forth the section 1983 claims against DeLuca and Stetler in separate counts. A third count named the Pennsylvania Department of Revenue as a defendant on a state whistleblower claim, but that claim

1

the Department of Revenue. Amended Complaint, ¶ 5-6.

In her briefs in opposition to the motions for summary judgment, plaintiff summarizes her theory and the evidence in support of her claims, presumably in the light most favorable to her, as follows:

> Plaintiff . . . was employed by the Pennsylvania Department of Revenue from March 21, 2006 until her termination, effective August 28, 2009. On December 8, 2008, pursuant to a subpoena, Vecchio testified against . . . DeLuca in connection with a grand jury investigation against him. After testifying against DeLuca, Vecchio began to be subjected to criticism and harassment at work.
>
> Both DeLuca and . . . Stetler were aware that Vecchio had testified in a grand jury investigation of DeLuca, particularly because the same was published in at least one newspaper article in March 2009. Stetler and DeLuca served together as State Representatives for sixteen of the twenty years they have known each other.
>
> On August 14, 2009, Vecchio was advised of her termination of employment with the Department of Revenue. Several days after her termination, Vecchio received a phone call from Joseph Brimmeier, CEO of the Pennsylvania Turnpike Commission, who pointed to DeLuca as the catalyst for Stetler's action of terminating her. Stetler, who admits that he was ultimately responsible for selecting Vecchio for termination, cannot provide a reason why she was discharged.
>
> The record facts show that DeLuca conspired with Stetler to violate Vecchio's First Amendment rights by terminating her employment in retaliation for her subpoenaed Grand Jury testimony against DeLuca.

Plaintiff's Briefs in Opposition to Summary Judgment (Doc. No. 101) at 4 and (Doc. No. 105) at 3.

Defendants concede, for purposes of summary judgment, that testifying before the grand jury is protected speech under the First Amendment, but argue that plaintiff has adduced no

---

against the Department of Revenue has been terminated without prejudice for plaintiff to file this claim in state court.

record evidence to support her factual assertion that DeLuca influenced Stetler to fire her. The Court agrees with defendants.

## II.     **Summary Judgment Standards**

Summary judgment is only proper when there is no genuine issue of material fact in the case and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c)(2); *Horn v. Thoratec Corp.,* 376 F.3d 163, 165 (3d Cir. 2004). In reviewing a motion for summary judgment, the role of the court is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). If so, summary judgment will not be granted.

The district court must view all of the facts in the light most favorable to the non-moving party, who is entitled to "every reasonable inference that can be drawn from the record," and if "there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." *Reedy v. Evanson*, --- F.3d ----, 2010 WL 2991378, *8 (3d Cir. 2010) (quoting *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000) and *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)). A party cannot, however, defeat a motion for summary judgment by pointing to fragmentary inferences that could be massaged to support her position. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." M*atsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

### III. First Amendment Retaliation Claims

A section 1983 retaliation claim predicated on the First Amendment must show that: (1) the plaintiff engaged in activity protected by the First Amendment, (2) the employer responded with retaliatory action sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) the protected activity was the cause of the retaliatory action. *Lauren W. ex rel. Jean W. v. Deflaminis*, 480 F.3d 259, 267 (3d Cir. 2007); *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006).

It is undisputed that in early 2009, the Department of Revenue began identifying positions to be eliminated due to drastic budget reductions necessitated by unprecedented revenue shortfalls, and eventually identified approximately 350 positions for elimination. Vacant positions were eliminated first, but 85 filled positions still had to be eliminated, and plaintiff's position was among them. Pursuant to this process, plaintiff was furloughed from her employment with the Department of Revenue on August 14, 2009, effective August 28th.

Nevertheless, plaintiff insists that her position was eliminated, not as a result of this unprecedented budget-position reduction, but because DeLuca influenced Stetler to fire her in retaliation for her testifying against DeLuca in a state grand jury proceeding. All of the record evidence, and all of the undisputed facts,[2] support the defendants' position; conversely, there are no facts of record supporting plaintiff's conspiracy-to-retaliate theory.

DeLuca, Stetler, and several other Department of Revenue officials and intermediary supervisors testified, consistently with one another, in depositions or in sworn affidavits, that DeLuca never told or influenced Stetler to fire plaintiff, and that the reduction and plaintiff's

---

2 Virtually all of the critical facts are undisputed, although plaintiff repeatedly denies that any adverse inferences can

inclusion in the positions to be eliminated were solely as a result of the unprecedented budget shortfall. Contrary to plaintiff's version of their telephone conversation, Brimmeier denies telling plaintiff that DeLuca asked him to retaliate against her, and he denies telling plaintiff that DeLuca asked Stetler to terminate or otherwise punish her. Except for Vecchio's and her husband's version of that "double hearsay" telephone conversation (discussed below), plaintiff offers *no documentary or testimonial evidence* that could remotely support her DeLuca-Stetler conspiracy theory.

Plaintiff's First Amendment retaliation claims come down to a generous inference she gleans from one ambiguous piece of double hearsay information, namely, her current version of what Joe Brimmeier said to her in the telephone conversation of August 19, 2009. Plaintiff's Counter Statement of Material Facts states as follows:

**Brimmeier Called Vecchio About DeLuca's Conspiracy With Stetler**

> 26. Joseph Brimmeier, CEO of the Pennsylvania Turnpike Commission, who knew Vecchio well, called her on August 19, 2009. (Vecchio 43).
>
> 27. When Vecchio saw that she was getting a phone call from the Turnpike Commission, she got her husband's attention, turned the volume on the phone up, and held the phone away from her ear so that her husband could also hear the conversation. (Vecchio 46-47).
>
> 28. Vecchio's husband, Edward, could hear the conversation between his wife and Brimmeier. (Edward Vecchio Aff. ¶¶ 2-4).
>
> 29. During their phone call, Brimmeier yelled at Vecchio because he understood that she was blaming him for her recent layoff from the PA Dept. of Revenue. (Vecchio 43).

---

be drawn against her from those undisputed facts.

> 30. He told Vecchio of a rumor that she accused DeLuca of getting Brimmeier's help to terminate Vecchio. (Vecchio 43).
>
> 31. Vecchio confirmed with Brimmeier that she had made such an allegation and based it on the close ties DeLuca has with Brimmeier. Vecchio 43).
>
> 32. Brimmeier informed Vecchio that although it was true that DeLuca approached him about her in the context of terminating her, Brimmeier refused because he did not want involvement in the matter. (Vecchio 43, 324).
>
> 33. Brimmeier proceeded to tell Vecchio that *DeLuca had gone to Stetler instead for the favor*. (Vecchio 43-44; Edward Vecchio Aff. ¶ 4).
>
> 34. Vecchio's husband, Edward Vecchio, personally heard Brimmeier deny that he was involved in Vecchio's termination and ask Vecchio to stop spreading such a rumor. (Edward Vecchio Aff. ¶ 2).
>
> 35. Edward Vecchio also heard Brimmeir say that DeLuca came to him about Vecchio but that Brimmeier refused to get involved. The context of the discussion was that DeLuca asked Brimmeier for help in getting Vecchio fired. (Edward Vecchio Aff. ¶ 3).

Plaintiff's Counter Statement of Material Facts (Doc. No. 107), ¶¶ 26-35 (emphasis added).

Any statements Brimmeier nay have made in the telephone conversation regarding any conversations he may have had with DeLuca is double hearsay. Hearsay may be considered by a court in deciding a summary judgment motion *if it would be admissible at trial*. See *Blackburn v. United Parcel Service, Inc.,* 179 F.3d 81, 95 (3d Cir. 1999) (citing *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n. 1 (3d Cir. 1996) (noting that a hearsay statement that is not capable of being admissible at trial should not be considered on a summary judgment motion)). However, plaintiff does not argue that the statements are not offered for their truth, nor does she argue that the hearsay statements are subject to some exception recognized by the Federal Rules of Evidence,

6

and this Court may not consider such hearsay in deciding the summary judgment motions. See *Smith v. City of Allentown,* 589 F.3d 684, 693-94 (3d Cir. 2009) (district court "refused to consider Smith's testimony about Spang's 'political enemy' comment on hearsay grounds. Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment. [citation omitted]. Smith's testimony is double hearsay because it describes a statement that Spang made to Smith about a conversation that Pawlowski allegedly had with Spang. Thus, for the 'political enemy' comment to be considered on summary judgment, Smith must demonstrate that both layers of hearsay would be admissible at trial. See Fed.R.Evid. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule. . . ."). . . . Spang disavowed any recollection of characterizing Smith as a political enemy of Pawlowski. Thus, Smith has failed to demonstrate that Spang could testify about the substance of the 'political enemy' comment at trial, leaving Smith without admissible evidence of Pawlowski's alleged sentiment. Without such evidence, the District Court properly refused to consider the 'political enemy' comment for summary judgment purposes.").

Plaintiff suggests only that if Brimmeier testifies at trial consistent with his deposition testimony (in which he denied having made such statements), she could impeach him with her and her husband's unrecorded, unwritten hearsay recollections pursuant to Fed.R.Evid. 607, and thus the statements would be "admissible" at trial. Assuming the Court would permit use of the hearsay statements for impeachment purposes, they would not constitute substantive evidence, and the jury would be so instructed. See *United States v. Gilbert*, 57 F.3d 709 (9th Cir. 1995) (impeachment is improper when employed as guise to present substantive evidence to jury that

7

would be otherwise inadmissible, and determination must be made as to whether government examined witness for primary purpose of placing before jury substantive evidence which is otherwise inadmissible); *United States v. Crowder*, 346 F.2d 1, (6th Cir.), *cert. denied* 382 U.S. 909 (1964) (testimony admitted to impeach witness does not supply needed substantive testimony). Accordingly, this double hearsay evidence cannot be considered in support of plaintiff's opposition to summary judgment.

Moreover, Vecchio's deposition testimony and her husband's affidavit regarding Mr. Brimmeier's hearsay statements about what DeLuca told him about what Deluca told Stetler are at best ambiguous, and do not provide any support for plaintiff's claims of retaliation or conspiracy. Vecchio's precise deposition testimony on this matter is as follows:

> COUNSEL: Q. As best you can recall, tell me every word that you recall Mr. Brimmeier saying in that conversation.
>
> VECCHIO: A. *I can tell you like I heard it yesterday*.
>
> Q. Please do.
>
> A. I was on the treadmill. The phone rings . . . My husband is laying in bed there. So I crank up the volume on the phone. And I knew it was Joe Brimmeier because it was the Turnpike's phone number. So I crawl up to where my husband is, and I turn it up, and I hit him, because I go, "It's the Turnpike." So, "Erin this is Joe Brimmeier." I went, "Yes, Joe." He goes, "Are you telling people that you," me, had him - - "had me fired?" And I went, "Well, yeah." . . . "Well, why would you think that?" I said, "Because he owns you. . . . And he goes, "Oh, I didn't have anything to do with it." He said, "He approached me before, and I told him I do not want involved." *He said, "He had to go to Stetler. He went - - he went to Stetler," like that.* And I said, *"That's funny," I said, "because Jay Costa called Stetler, and Stetler said it wasn't him, it was the people - - the lower people down in my office, lower management, like Cheryl and Dale."* . . . I said, "Well, Joe, if you had nothing to do with it, what do you care?" I said, "You are the head of the frigging Turnpike. What do you care what I say?" . . .

8

        \*   \*   \*

Q. Is that pretty much the extent of it?

A. Pretty much it, yeah.

Q. *Now, you said that he said, he meaning Mr. Brimmeier, in reference to Mr. DeLuca, said "he had to go to Stetler."*

A. *Yeah.*

Q. *Did he say whether he had any knowledge or information that Mr. DeLuca, in fact, went to Stetler?*

A. *No.*

Q. *So he was - - that was his speculation?*

A. *Yes. The same speculation that Jay Costa had the day before.*

Q. And he speculated that Mr. Brimmeier did it, Mr. Costa - - I am not sure which speculation you are referring to.

A. No. I had a phone call with Jay Costa the day before.

Q. Uh-huh.

A. *Jay Costa called Stetler because he told me that Tony would have had to go to Stetler to get me fired because nobody else had the power to do it.*

Q. But did Costa tell you that Brimmeier told him that?

A. Oh, no. I don't even think he talked to Brimmeier.

Q. Other than your conversations with Mr. Brimmeier and Mr. Costa after the fact, are you aware of any other witness who has knowledge or information that Mr. DeLuca went to Mr. Stetler or somehow associated with Mr. Stetler to bring about your inclusion in the layoff?

A. Say that again.

> Q. - - *did you talk to anybody after your layoff about whether Mr. DeLuca had anything to do with the layoff*?
>
> A. *Nobody that actually had any actual facts, no*.
>
> Q. Okay.
>
> A. *Just people presuming*, you know, the same thing that Joe and Jay said.

Appendix (Doc. No. 99), Exhibit 1 to Defendant Stetler's Concise Statement of Material Facts, at pp. 323-326 (emphasis added).

Thus, plaintiff's own testimony about Brimmeier's conversation, if fully credited, would show only that Brimmeier stated the obvious -- if DeLuca wanted to retaliate against Vecchio, he "had to go to Stetler," because Stetler was the Secretary of the Department and had ultimate responsibility for terminating plaintiff. That ambiguous inference, however, is not *evidence* that DeLuca in fact went to Stetler, influenced Stetler, or that Stetler was influenced by anything other than his subordinates' recommendations about which positions should be eliminated due to the budget deficit. Plaintiff's speculation from the Brimmeier conversation that DeLuca influenced Stetler to fire her raises no more than some metaphysical doubt, and not a genuine issue of material fact.

Much of plaintiff's argument in opposition to summary judgment is that defendants' articulated reasons for her termination are pretext, relying almost entirely on her inferences from the Brimmeier hearsay. The Court need not and does not reach to the pretext stage of the anaylsis, however, because plaintiff's speculation does not and cannot meet her threshold burden of proving *prima facia* that DeLuca influenced or persuaded Stetler to terminate her. In the

absence of such proof, plaintiff's complaint must be dismissed.

An appropriate order will be entered granting summary judgment for defendants.


                                                                                 s/ Arthur J. Schwab
                                                                                 Arthur J. Schwab
                                                                                 United States District Judge

cc:     All Registered ECF Counsel and Parties